James V. GLASCOCK,
Petitioner-Appellant,

v.

Elizabeth Ann GLASCOCK,
Respondent-Respondent.

No. WD 32545.

Missouri Court of Appeals,
Western District.

Aug. 4, 1981.

Robert L. Roper, Jr., Columbia, for petitioner-appellant.

Larry M. Woods, Columbia, for respondent-respondent.

Before MANFORD, P.J., and DIXON and NUGENT, JJ.

PER CURIAM:

This is the second appeal of this case. In the first appeal, this court dismissed the

appeal because the decree did not dispose of all of the marital property. *Glascock v. Glascock*, 607 S.W.2d 834 (Mo.App.1980). Pursuant to the suggestion of the court in the prior opinion—that the parties consider the procedure suggested in *New Style Homes, Inc. v. Fletcher*, 600 S.W.2d 634 (Mo.App.1980), to expedite the appeal where a case had been reversed solely because of a lack of finality of the judgment—and acting upon that procedure, the appeal has been relodged in this court and was immediately resubmitted to the same panel which heard the argument in the first instance.

The points raised by the husband on this appeal, as in the prior appeal, relate to factual determinations of the trial court with respect to maintenance and division of property upon unresolved conflicts in the valuation evidence. An understanding of the disposition of the appeal requires a substantial and detailed statement of facts gleaned from the transcript and the exhibits filed.

*Marital History*

The parties were married in October of 1966, and at the time of trial in 1979, the husband was 36 years old, the wife, 35. At the time the parties met, the wife was doing typing and secretarial work in Columbia, Missouri, where the husband was attending school and working.

The wife continued her work for two years after the parties were married, until 1968 when their first child was born. During this time, the husband worked for a Mr. Crowe as a resident apartment manager in Columbia, and also received his law degree in 1968 and a master's degree in business administration in 1969. He then spent two years in the military; and upon his discharge, he returned to work for Crowe in 1971.

Crowe was and remained at the time of trial the owner of the largest apartment complex in Columbia, and from 1971 until 1978, the husband worked full time for Crowe. The husband provided accounting, legal, and management services to Crowe during this period. The husband's gross income from his employment with Crowe over the past three years had been $29,999.84 in 1976; $32,480.94 in 1977, and $33,000.24 in 1978. The husband also had some income from additional law practice totaling $3,750 in 1977 and $6,324 in 1978. The wife had not worked since the first child was born in 1968. (The husband's subsequent employment history, after the separation, will be developed later).

In 1972, the parties had their second child and in 1977 they purchased a home which they restored and in which the wife was currently living. In 1975, the husband purchased, as a tenant in common with his brother, a 192–acre farm in Ralls County from his aunt and father.

In June of 1978, the husband separated from the wife, citing pressures from work, his wife, and the restoration of the home. A further cause of the separation was the husband's discovery of his physical attraction toward a female apartment manager at Crowe's Complex. The husband began dating her in July of 1978, and the relationship became intimate in September of 1978.

The husband's disharmony with his wife allegedly began in 1973 with constant complaints from her about the number of hours that he worked a week. The husband stated that the wife had a constant list of jobs for him to do when he wasn't working; that she was socially incompatible and needed constant reassurance; that she delegated the discipline of the children to him and that she preferred to spend the money he earned on silver, china, and furniture instead of placing it in investments as he wanted to do. The husband felt there was no chance of reconciliation, one of the factors being his intimacy with the apartment manager.

The wife's complaints against the husband centered around the number of hours he worked, the fact that he liked to sit around the house, watch sports, and drink beer on Saturdays, and that he often told her to leave him alone and to cease bothering him with her complaints. He was a compulsive worker by his own admission,

couldn't work a 40-hour week, and cannot change.

*Misconduct History*

Both the husband and wife testified about their own misconduct and that of the other. The majority of these incidents occurred after the separation.

The husband testified to two prior, isolated occasions upon which he had been unfaithful, once in 1969 for one night and once in 1977 for two nights. He admitted that he was currently having intercourse with the apartment manager. He also stated that he told the wife of these incidents after the separation.

The wife's allegations of misconduct centered around finances and the children. She stated that he induced her to sign a post-separation income tax refund check on the promise of receiving one-half the money, but that he had not paid her because she refused to allow him to visit the children. She also stated that he was not responsible when he did keep the children, citing a water-skiing accident, an alleged indiscretion by the husband's father with one of the daughters, and his leaving them alone at night when he worked.

The husband stated that the wife refused him visitation with the children after the separation except for six hours on Sundays; that he saw them less than 24–36 hours a month; that she alienated the children from him by calling him names in their presence and degrading his girlfriend and that she left the kids alone sometimes.

Both parties admitted exchanging obscene phone calls immediately after the separation.

*Marital Property*

Both parties gave detailed testimony as to the value of the marital property. The husband testified to a market value of $220,002.00 with a net value (subtracting all liens) of $91,651. The wife valued the marital property at a market value of $244,180.23 with an adjusted net value of $137,961.63. While there was a $7,200 difference of opinion as to the value of the household goods, the balance of the approximately

$48,000 difference can be attributed to a disagreement between the parties as to the value of the 192–acre farm in Ralls County. The husband gave it a net value of – $7,250; the wife netted it at + $31,400.

The controversy as to the value of the farm stems from (1) the manner in which it was purchased; (2) any increases in value; and (3) the value of property surrounding it.

The husband testified that he and his brother bought the farm, which was next to their parents' farm, from their aunt and father, for $73,500 in 1975. This price was reached by averaging the value placed on the property by two appraisers and no outside purchasers were solicited. The husband believed the farm was worth $95,000 (his half being $47,500) at trial, but due to borrowing for farm equipment and losses from the farm operation over the 3–year period, he netted the farm value at a – $7,250. The husband admitted that the farm losses were from a tax standpoint, and that a combination of investment credits, write-offs and depreciation had enabled him to receive substantial tax refunds from the farm operation. The husband knew the farm to the immediate west had sold three or four months before trial for $1,000–$1,250 an acre; but it was 100% tillable as opposed to 90/192 tillable acres on his place.

The wife, on the other hand, stated that based on sales of the surrounding farmland within the last year the farm was worth $900 an acre; or her husband's half being $86,400. This opinion was based on what she had heard about comparative farm sales immediately next to or within four miles of the farm and also based on a discussion with a realtor in the area. The wife did admit that she wasn't as familiar with the value of the property as the husband; that she didn't know what percentage of it was tillable, nor had she any training in real estate matters.

The discrepancy in the value of the household goods stemmed primarily from the fact that the wife thought all the furniture values asserted by the husband should be discounted 25%.

## Financial Positions of the Parties

### The Husband

Beginning in 1979, and coincidental with the marital disharmony, the husband entered a new working arrangement with Crowe. He stated that he went from a full-time employee to a part-time employee at $20 an hour. He and Crowe anticipated that he would work 50% of the time (or roughly 1,000 hours annually) at this rate. During the first three months of 1979, he had worked 388–389 hours and received, after taxes, $5,600 in wages from Crowe. The husband explained that this overage was due to an increased work-load during the first of the year which he did not anticipate would be indicative of the remainder of the year. His arrangement with Crowe was very flexible.

In addition to his $20 an hour salary, the husband was receiving rent free a $270 a month furnished apartment, the use of an automobile, and his country club dues. He was unsure how long these first two arrangements would last—"probably for awhile."

The remainder of the husband's employment efforts were being channeled into his new property management business. At trial, he was serving as a manager for three different organizations, and based on a percentage of gross receipts, his combined monthly gross income from these operations totaled $770. He had the capabilities of accepting more management projects.

Based on an anticipated 80 hours a month for Crowe and the management receipts of $770 a month, the husband anticipated that his 1979 gross income would be between $29,000–$30,000. He felt as though he would be employed forever and that he had no expectations of a lessened income in the future.

The husband was also involved in three other projects: a management corporation designed to develop and sell old property; a project to build a medical office complex; and a plan to develop a 32-unit condominium. Although none of these had generated any income to date, and he had expended $2,100 on them, he had every reason to believe the first project would eventually make money, and that the second project could possibly result in a "huge profit."

In conjunction with his management business, the husband stated that his expenses were $107 a month for rent and $212 a month total for salaries to three employees.

### Personal Expenses

The husband estimated his monthly personal expenses at a total of $1,200–$1,300, broken down as follows:

| | |
|---|---|
| Utilities | $ 115 |
| Car | 100 |
| Insurance | 64 |
| Food | 200, or $100 if he ate at home |
| Clothing | 25 |
| Laundry | 20 |
| Recreation | 100 |
| Taxes | 702 (based on a $2,400 month gross) |

He estimated that after taxes he could only afford to pay approximately $500 monthly to the wife and children. He stated that he had been paying her over $1,500 a month since the separation, but that the money was "scrounged" and that it constituted 98% of his income out of $9,715.65 earned during the first four months of 1979 ($5,610 net from Crowe, $1,300 gross from Crowe, and $2,836 gross from his management company), he had given her $6,321.

### The Wife

The wife stated that she had a college degree in fashion design and that she also was able to type 60 wpm while employed in the 1960's. She had not worked since the first daughter was born, but as soon as the threat of decreased income arose, she sought employment in her fields. Three efforts to find work had proved futile. She had made no attempt to further her education.

She stated that she was healthy, but that she felt the husband should provide all of the support because she didn't feel she should work and leave the kids; she would have to give up some volunteer work of 20 hours a week and it wasn't fair for the

husband to force her to work just because he wanted a girlfriend.

The two daughters were in the 5th grade and kindergarten, and the wife did not feel it would be to their benefit if she worked. The girls would not have anyone to pick them up from school and take them to piano or ballet lessons or Girl Scouts. There would also necessarily be a babysitter expense if the wife worked.

*Expenses*

The wife estimated her monthly expenses at $1,481, broken down as follows:

| | |
|---|---|
| Mtg., taxes, and insurance on house | $ 420 |
| Utilities | 240 |
| Car | 91 |
| Insurance | 100 |
| Food | 210 |
| Clothing | 205 |
| Medical | 70 |
| Laundry | 10 |
| Recreation | 30 |
| School Supplies | 25 |
| Piano & Ballet Lessons | 50 |
| Home Maintenance | 50 |

On cross, she stated the utility and medical bills were high due to repairs and some illnesses.

She admitted spending $1,094.91 on an expensive coffee table, some wine glasses, drapes, and picture frames after the separation and that she probably spent this money to punish the husband.

She stated that she wanted all the household goods, the house, the car, and $1,500 monthly.

*Judgment*

The trial court divided the marital property and set aside the non-marital property in the original judgment with the following language:

"Ten shares of Kern Sunset Oil, Inc., $650.00 savings account at 1st Bank of Commerce, household goods and furnishings owned by Respondent prior to marriage or given to her as gifts, and jewelry owned by Respondent prior to marriage or given to her as gifts are set aside to Respondent as non-marital property. Marital property divided as follows: To Petitioner—Ralls County farm, farm partnership property, including bank accounts, farm truck subject to debt, 5040 Allis Chalmers tractor subject to debt; Century State Bank stock; ½ savings account in Century State Bank; ½ savings account in 1st Bank of Commerce; 1966 Ford truck subject to debt; household goods, furniture, fixtures and appliances in apartment at 2208 White Gate Drive; grain produced on farm; Certificate of Deposit subject to debt; American National Life Insurance and Fidelity Union Life Insurance policies; clothing and personal effects; Century State Bank checking account 21–824–3 in Petitioner's name; ½ joint checking account 46–829–5 in 1st Bank of Commerce; and file cabinet, desk and chair in residence. To Respondent—residence subject to debt secured by Deed of Trust and household goods, furnishings, fixtures and appliances therein except file cabinet, desk and chair; ½ savings account in Century State Bank; ½ savings account in 1st Bank of Commerce; 1968 Pontiac station wagon; $1,779.77, being ½ of 1978 federal income tax refund; clothing, personal effects, jewelry, paintings, silver and china; ½ checking account 46–829–5 in 1st Bank of Commerce.

The court also awarded $250 per month per child for support and $700 monthly maintenance.

On the original appeal of this decree, the appeal was dismissed for failure to value and divide or set over three assets disclosed in the evidence. The opinion cites *Fields v. Fields,* 584 S.W.2d 163 (Mo.App.1979), and *Nilges v. Nilges,* 564 S.W.2d 262 (Mo.App. 1978), and points to the rule of those cases in the following language:

The decree must designate all property as either marital or nonmarital, designate the future title and the valuation of the asset in accordance with the determination of the court in the overall division. *Fields, supra.* . . . As in *Nilges, supra* at 264, the court may on proper notice and

motion, vacate, modify, or correct any part of the decree entered.

607 S.W.2d at 835.

In response to that opinion, the parties filed a stipulation which is in pertinent part as follows:

| ITEM OF MARITAL PROPERTY | VALUE (as of November 3, 1980) | SPOUSE AWARDED PROPERTY |
|---|---|---|
| 1. 50% Interest in Innovative Management and Investment, Inc., a Missouri corporation | – $9,295.95 | James V. Glascock |
| 2. General partner's 21.428% interest, Renaissance Renovation and Development, a Missouri general partnership | – 763.56 | James V. Glascock |
| 3. General partner's 16⅔% interest, Greenbriar Creek Development Company, a Missouri limited partnership | – 9,104.30 | James V. Glascock |

The court then entered an amended decree, in pertinent part, as follows:

6. The following-described property is hereby declared to be the non-marital property of Respondent:

a) Ten (10) shares of Kern Sunset Oil, Inc.; and

b) Six Hundred Fifty Dollar ($650.00) savings account at First Bank of Commerce; and

c) Household goods and furnishings, and jewelry, owned by Respondent prior to marriage or given to her as gifts.

7. The following-described property is marital property that is hereby awarded to Petitioner:

a) An undivided one-half (½) interest in a farm in Ralls County, Missouri, subject to debt, said real estate being described as follows:

.    .    .    .    .

b) An undivided one-half (½) interest in farm personal property, including bank accounts; and

c) Century State Bank stock; and

d) One-half (½) of the savings account in the Century State Bank as of May 16, 1979; and

e) One-half (½) of the two savings accounts of the parties in the First Bank of Commerce, as of May 16, 1979; and

f) 1966 Ford truck and tractor, subject to debt;

g) Household goods, furniture, fixtures and appliances in Petitioner's apartment at 2208 White Gate Drive, Columbia, Missouri; and

h) Grain produced on Ralls County farm; and

i) Certificate of Deposit, subject to debt; and

j) American National Life Insurance and Fidelity Union Life Insurance policies, subject to debt; and

k) Clothing and personal effects; and

l) Century State Bank checking account no. 21–824–3 in Petitioner's name; and

m) One-half (½) of the joint checking account no. 46–829–5 at First Bank of Commerce, Columbia, Missouri, as of May 16, 1979; and

n) File cabinet, desk and chair at 206 South Glenwood Street, Columbia, Missouri.

o) Fifty percent (50%) interest in Innovative Management and Investment, Inc., a Missouri corporation; and

p) General partner's 21.428 percent interest in Renaissance Renovation and Development, a Missouri general partnership; and

q) General partner's 16.667 percent interest in Greenbriar Creek Development Company, a Missouri limited partnership.

8. The following-described property is marital property that is hereby awarded to Respondent:

a) House and lot at 206 South Glenwood Street, Columbia, Missouri, subject to debt, the legal description of said real estate being as follows:

.    .    .    .    .

b) Household goods, furnishings, fixtures and appliances at house at 206 South Glenwood Street, Columbia, Missouri, except those awarded to Petitioner herein; and

c) One-half (½) of the savings accounts of the parties in Century State Bank, as of May 16, 1979; and

d) One-half (½) of the two savings accounts of the parties in First Bank of Commerce, as of May 16, 1979; and

e) 1968 Pontiac station wagon; and

f) One Thousand Seven Hundred Seventy-nine and 77/100 Dollars ($1,779.77), representing one-half (½) of the 1978 Federal income tax refund; and

g) Clothing, personal effects, jewelry, paintings, silver and china; and

h) One-half (½) of the checking account no. 46–829–5 at First Bank of Commerce, Columbia, Missouri, as of May 16, 1979.

By a separate point, the husband raises the question of the propriety of the trial court's division of the marital property. The argument of the parties on this point illustrates with great clarity the difficulty in reviewing divisions of property in which the trial court has failed to value assets and property when the parties present conflicting evidence of value.

It is apparent, and the parties agree, that the points of dissension between them with respect to the division of property focus upon their disagreement on the valuation of the farm and the household goods.

The husband argues that upon the basis of his testimony concerning the value of the farm the wife received approximately 80 percent of the net value of the property; but on the other hand, if Mrs. Glascock's testimony is accepted, then the division is on the basis of 54 percent to the wife and 46 percent to the husband. The husband urges that we disregard the testimony of the wife as "simply not credible." The husband further argues that even if we assume that the trial court split the difference between the testimony of the parties with respect to the values to be ascribed to the personal property and the farm, the division would still be inequitable and unjust as far as the husband is concerned.

The husband then urges that based upon his valuations, the court misapplied the fac-tors to be considered by the court in determining a just division of the property pursuant to § 452.330 RSMo 1978.

The wife counters by asserting that her testimony concerning the value of the farm and of the personal property was credible and accepted by the trial court which in the view of the wife resulted in a 50/50 disposition of the marital property.

This presents precisely the problem in other cases involving the division of marital property where the decree did not value the assets divided. *Shepherd v. Shepherd*, 618 S.W.2d 709 (Mo.App.1981); *Salisbury v. Salisbury*, 614 S.W.2d 558 (Mo.App.1981); *Wansing v. Wansing*, 612 S.W.2d 55 (Mo. App.1981).

What the parties ask this court to do is to settle a dispute involving the credibility and weight of valuation evidence which should have been settled and determined in the trial court. The inescapable result of a resolution of this point is for this court, upon the basis of a cold record, to arbitrarily value the assets of the parties and then reapply the statutory factors to determine the justness of the distribution of the trial court's decree. This court would then be substituting its factual determination for what may have been a contrary factual determination by the trial court and would, in fact, result in a trial de novo on a record rather than on the basis of live testimony with respect to the values to be ascribed to the various properties.

■ It is settled beyond dispute that review of dissolution decrees is pursuant to *Murphy v. Carron*, 536 S.W.2d 30 (Mo.banc 1976). A review under *Murphy v. Carron* is not and should not be a determination in this court of factual issues unresolved by the trial court. Review under *Murphy v. Carron* involves an examination of the evidence to see if there is substantial evidence to support the trial court's findings; second, a weighing of the evidence *if* this court is firmly convinced that the judgment of the trial court is in error; and third, an examination of the issues presented to see if the law has been correctly declared and proper-

ly applied. Nothing in *Murphy v. Carron* requires this court to independently determine a factual basis for the decree of the trial court. Such a determination of the essential facts in contested litigation simply should not and will not be undertaken at the appellate level. *Shepherd; Salisbury; Wansing, supra.*

 The decree of the trial court is reversed and remanded with respect to issues of maintenance and division of property. It is apparent from what has been said with respect to the division of property that the issue of maintenance cannot be resolved in conformity with § 452.335 RSMo 1978, which requires a consideration of the value of the property set apart to the spouse in determining the need for and the amount of maintenance. The case is reversed and remanded with directions to the trial court to resolve the disputes in connection with the value of the various properties and enter a new decree reflecting the trial court's determination of the value of the property set off to each spouse.